THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GUY S. LEVINE, Defendant-Appellant.

Fifth District    No. 80-100

Opinion filed August 10, 1981.

Robert Weiner and Terry L. Fields, both of Springfield, for appellant.

Kelly D. Long, State's Attorney, of Hillsboro (Martin N. Ashley and Gillum Ferguson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE WHITE delivered the opinion of the court:

The defendant was arrested in Macoupin County, Illinois, on May 29, 1978, for an offense that occurred in Montgomery County, Illinois, on May 28, 1978.

On May 31, 1978, he was charged in an information with unlawful restraint (Ill. Rev. Stat. 1977, ch. 38, par. 10—3(a)). Subsequently, on March 29, 1979, two additional counts were added to the information charging deviate sexual assault (Ill. Rev. Stat. 1977, ch. 38, par. 11—3(a)) and indecent liberties with a child (Ill. Rev. Stat. 1977, ch. 38, par. 11—4(a)(2)). The defendant pleaded not guilty, demanded a trial by jury, was tried by a jury, convicted on all three counts, and sentenced to the Department of Corrections, Adult Division, for a period of 15 years on the charge of deviate sexual assault, 8 years on the charge of indecent liberties with a child, and 2 years on the charge of unlawful restraint, all sentences to run concurrently. He was also fined $1,829.00

On appeal the defendant raises the following issues:

1. The trial court erred in denying defendant's motion to suppress the in-court identification of defendant by the victim.

2. Defendant was not proven guilty beyond a reasonable doubt.

3. The State's Attorney's closing argument was so prejudicial as to deny defendant a fair trial.

4. The conduct of the State's Attorney was so prejudicial as to amount to a violation of defendant's constitutional right of due process.

5. The trial court erred in failing to grant relief to defendant because of pretrial and trial publicity.

6. The trial court erred in denying the defendant's motion to change place of trial.

7. Trial court erred in denying defendant prompt preliminary hearing on the charges of deviate sexual assault and indecent liberties with a minor.

8. No probable cause existed for the defendant's arrest.

9. Defendant's motor vehicle was illegally searched.

10. Trial court erred in denying defendant and his counsel a copy of an anonymous letter from the file of the State's Attorney.

11. Trial court erred in conducting the voir dire examination of the jurors.

12. The sheriff of Montgomery County violated the defendant's constitutional rights because of contact with the jury.

13. Trial court erred in communicating with the jury outside the presence of the defendant and his counsel.

14. Trial court erred in permitting testimony of witness Brad Ozee.

15. Trial court erred in admission of certain exhibits of the People.

16. Trial court erred in denying the defendant's second motion for psychiatric examination of complaining witness.

17. Trial court erred in giving certain instructions of the People.

18. Trial court erred in entering a judgment of conviction on each count of the information.

THE FACTS

The victim in this case is a 15-year-old minor male residing in Litchfield, Illinois. Because of the nature of the case we have determined that no useful purpose will be served by publishing the name of the victim. Hereinafter, he will be referred to as "the minor."

On May 28, 1978, at approximately 2 o'clock in the afternoon, the minor was walking from his home in Litchfield, Illinois, to a grocery store to redeem certain trading stamps. Enroute to the store a Chevrolet El Camino vehicle pulled up alongside him, and he was forced into the vehicle by the driver. The driver drove around the city of Litchfield and out into the rural area towards Mount Olive, Illinois, telling the minor that he was looking for a junk yard. During the ride the minor made an effort to jump out of the car, but the driver pulled him back and told him not to try that again, that he had a gun in the glove compartment and would kill him. During the ride the driver had the minor write his phone number on a grocery receipt and gave the minor a black Flair pen, that wrote with green ink. The pen was in the ash tray of the vehicle. After they returned to Litchfield, the driver let the minor out of the vehicle and drove away. The minor went to his home, called his sister who was working at the Dairy Queen, and told her what had occurred. His sister called the Litchfield city police, and Officer Brad Ozee went to the minor's home where he interviewed the minor. In the meantime, the minor had observed the El Camino driving past the house a couple of times.

At Officer Ozee's initial interview the minor told the officer that the El Camino was silver and white or white with a white covering on it.

Officer Ozee returned later that evening to interview the minor again in the presence of his parents, who were out of town at the time of the occurrence. Officer Ozee felt it was best to interview the minor in the presence of his parents. Because of the proximity of Litchfield to the interstate highway, the officer did not immediately put out an alert thinking the El Camino was probably far away.

The next day the minor's sister observed an El Camino fitting the description given to her by her brother drive past the place of her employment. She notified her mother, who in turn notified the police. Later on the same date the minor's step-father observed a silver or white El Camino in Litchfield driving towards Gillespie, Illinois. He followed the El Camino towards Gillespie, passed it, and went to the Gillespie Police Department where he informed the dispatcher that the El Camino was in Gillespie and that the driver was wanted for an abduction in Litchfield the previous day. After receiving verification by the Litchfield Police Department a radio dispatch was put out requesting the El Camino, and the driver be picked up and brought back to the Gillespie Police Department. As a result of this radio dispatch a Macoupin County deputy sheriff saw the El Camino, stopped it, and informed the driver he was wanted, requested him to drive to the Gillespie Police Department and followed him there. After the radio dispatcher notified the Litchfield Police Department that they had the defendant in custody, Officer Ozee picked up the minor and transported him to the Gillespie Police Department. At the Gillespie Police Department the minor was shown a photographic lineup consisting of five photographs, one of the defendant in color and four black and white photographs of other individuals. The minor identified the defendant. He was placed under arrest and transported to the Macoupin County jail. The El Camino was taken to a local garage in Gillespie where it was searched, and a black Flair pen that wrote with green ink was found in the ash tray.

Subsequently, charges of unlawful restraint were filed against the defendant.

Several months after the original occurrence, at the request of the State's Attorney the minor was given a further examination, and as a result of this interrogation the additional charges were filed.

From the date the original information was filed in this case, the court was deluged with pretrial motions by both sides. The wheels of judicial procedure began to spin almost immediately and are still spinning.

We will discuss the motions which required evidentiary hearings.

*Evidence at the hearing on defendant's motion to quash arrest.*

(A) Kenneth Robertson testified that he was deputy sheriff in Macoupin County, and that he had stopped the defendant in Gillespie, Illinois, on Route 4 at approximately 9:15 p.m. on May 29, 1978, as a result

of a dispatch that came from the Gillespie Police Department to pick up and hold the vehicle and driver. He also testified that he had received a description of the driver as being six feet tall, approximately 200 pounds, brown and gray greasy hair, wearing oval sunglasses with yellow lenses and a light blue shirt. He testified that in his opinion the defendant matched this description. He testified that the defendant was cooperative and that when he asked him to drive the El Camino to the Gillespie Police Station the defendant honored the request, and the arresting officer followed him to the Gillespie police station. At the police station, the Litchfield Police Department was notified that the defendant was at the Gillespie police station.

The witness testified that at the time he stopped the defendant he was not violating any laws, and that, to the witness' knowledge, there were no arrest warrants outstanding for the defendant. The witness did not search the vehicle at the initial stop. The witness testified that Deputy Bertognolli of the Macoupin County Sheriff's Department read the defendant his *Miranda* rights, that the El Camino was parked outside the police department, and that eventually the defendant was placed in custody and transported to the Macoupin county jail in a county car. He further testified that a local garage picked up the El Camino to transport it for impounding and that at the garage he participated in the search of the automobile after the defendant had given consent to search. He further testified that when he made the search he was looking for a Flair pen and that he could see a Flair pen in the car in the ash tray.

He testified concerning the photographic lineup. He assisted in getting the photographs from the Gillespie Police Department files of persons other than the defendant. He did, however, observe the defendant being photographed at the Gillespie Police Department.

The trial court found "the officer had reasonable grounds and therefore the motion will be denied."

*Evidence on defendant's motion to suppress (hearing date November 28, 1978).*

(a) Sister of the minor:

This witness testified that on the date of the occurrence she was working at her place of employment in Litchfield, her brother called her, he was crying and said something about being picked up by a man and driven around, that later the police officers brought the minor to her place of employment and that he stayed with her until their parents came home. She further testified the minor described the car to her, that a couple of days later she saw a silver El Camino driving east on Union Avenue and shortly thereafter drive back towards Gillespie. At this time she called her "mom" and told her about the El Camino.

(b) Jerry Cahill:

This witness testified he worked for the Litchfield city police, that on May 28, 1978, he saw the minor with Officer Ozee, that he did not hear any description given by the minor of the vehicle in question. He later got a call from Officer Ozee telling him that a silver El Camino had been spotted on Union Avenue.

(c) John Flynn:

This witness testified that he was a police lieutenant for the city of Litchfield, that he was on duty on May 29, 1978, that around 9 o'clock he was made aware that the defendant had been stopped by Sergeant Robertson, and that he advised Officer Ozee that the defendant was being held at Gillespie. He further testified concerning the procedure in keeping records in the Litchfield City Police Department.

(d) Larry Jackson:

This witness testified that he was a police officer with the Gillespie Police Department and had been employed in that capacity since March 3, 1978. On the night the defendant was arrested he was on duty patrolling the streets of Gillespie, he heard the radio dispatch describing the El Camino and that it was a possible "1032," which means a gun might be involved. He testified that the defendant was supposed to have whitish hair, in his forties, big nose, not real long hair but thick hair, that he had communication with Sergeant Robertson of the Macoupin County Sheriff's Department who informed him concerning the Sergeant's participation in the arrest in Gillespie. He could not remember if the vehicle was left at the Gillespie Police Department for a while or impounded immediately. He also testified that he was not familiar with what occurred at the police department because he received another call and left.

(e) Step-father of the minor:

This witness testified that he was the step-father of the minor, that on the date of the occurrence the minor had a conversation with the minor's mother and the witness concerning the occurrence, that the minor gave him a description of the El Camino, that on the date of the arrest he saw the El Camino at The Gardens Cafe in Litchfield westbound on Route 16 towards Gillespie, that he followed the automobile to Gillespie passing it prior to reaching the city limits, that he went to the police station, gave the dispatcher a description of the El Camino, asked that it be stopped and the man questioned concerning an occurrence the day before in Litchfield, that he was there when the defendant was brought to the police station, that he observed the El Camino at the Gillespie Police Department, that he observed the photographic lineup being put together, that he was in the police station but not near the minor when he made the identification and that to the best of his knowledge no one made any suggestion to the minor concerning the photographic evidence.

(f) Donald Bertognolli:

This witness testified that he was a deputy sheriff of Macoupin County for 3½ years, that on the date of the arrest he saw the defendant at the Gillespie Police Department between 10:30 and 11:30 p.m., that to his best recollection the defendant gave verbal permission for search of the El Camino, that no written consent was obtained, that he could not definitely state that the defendant gave permission for the search of the El Camino, and that he was not present at the photographic lineup and did not participate therein.

(g) Dave Brand:

This witness testified that he was a partner in the operation of the Quality Motors in Gillespie, Illinois, that on the date of the arrest he received a call to tow the vehicle to his business establishment, that he came to the Gillespie Police Department at about 10 p.m., that Sergeant Robertson secured the keys from the defendant, that the automobile was towed to Quality Motors on Route 4 in Gillespie and that Sergeant Robertson made the search.

He further testified that at no time did he see a pen in the automobile and that he did not actively participate in the search of the motor vehicle.

(h) Larry Norville:

This witness testified that he was a partner in the Quality Motors in Gillespie, that on the date in question Mr. Brand and he went to the Gillespie Police Department sometime between 10 and 11 p.m., and they towed the vehicle to Quality Motors, that he watched Sergeant Robertson and Patrolman Larry Jackson conduct the search, that he also took a picture of the pen in the ash tray of the El Camino and that he had seen the pen in the ash tray while the El Camino was parked in front of the Gillespie Police Department.

(i) Kenneth Robertson:

This is the same Kenneth Robertson that testified at the September 21, 1978, hearing. At his hearing he testified that he conducted the search of the vehicle in question at Quality Motors, that the owners of Quality Motors and Officer Rick Stennet were present at the search, that the defendant had given him permission to search the El Camino, and that the only thing taken from the El Camino was the Flair pen. He further testified that he did not see the Flair pen in the ash tray at the initial stop of the defendant, that he did see the Flair pen in the ash tray at the Gillespie Police Department before Officer Ozee arrived, that only after the conversation with Officer Ozee was he aware of the significance of the Flair pen, that nothing was taken from the automobile other than the Flair pen although he saw photographs lying on the seat, and in his opinion he was conducting an inventory search.

*Evidence on defendant's motion to suppress (hearing date December 22, 1978).*

(a) Brad Ozee:

This witness testified further concerning the date of the occurrence, his conversations with the minor and the minor's step-father, mother and step-sister. He testified that on the date of the arrest he transported the minor from his residence in Litchfield to Gillespie, that on the way to Gillespie he had a conversation with the minor concerning the description of the automobile, and that the minor, during this conversation, informed him about the Flair pen in the ash tray. At the suggestion of Lieutenant Flynn of the Litchfield Police Department, he asked that a photographic lineup be conducted at the Gillespie police station. He further testified that when they approached the Gillespie Police Department the minor became very excited and said, "There it is, there is the El Camino. I will never forget it." He testified that he assisted in arranging the photographs for the photographic lineup and that the defendant's picture was taken at the Gillespie Police Department. He further testified that he placed the defendant under arrest after the minor had identified the El Camino and that they saw the Flair pen in the ash tray exactly where it was described to him on the way to the police department. The defendant did not give him permission to search the El Camino, and he did not hear the defendant give anyone else permission to search the El Camino.

(d) The minor victim:

Upon direct examination the victim stated that he identified the defendant's photograph at the Gillespie police station, that he would be able to recognize the man whether he had seen the pictures at the Gillespie police station or not, that he would be able to recognize the El Camino, that at no time did the man try to hide his face from him, that he had no difficulty observing him during the time he was in the presence of the defendant on the date of the occurrence, and that he was in the El Camino between 30 and 45 minutes.

Upon cross-examination, the minor testified that he observed the black interior of the automobile, that the defendant had handed him the Flair pen with which to write down his telephone number and address, that he uses Flair pens and recognizes a Flair pen when he sees one, that the man had thick eyebrows, that he had a ring on one of his fingers and had long sideburns but that he couldn't remember if his ears were covered by hair or not. He further testified that after he told Officer Ozee about the Flair pen he was taken to the El Camino and a police officer shined a flashlight in towards the ash tray on the inside of the El Camino and he observed the Flair pen. He also testified that when he had finished writing with the Flair pen he put it on the dash, and that the pen was black and

wrote with green ink. The victim further testified that he told his parents and Officer Ozee about the Flair pen on the night of the occurrence.

(c) James Smith:

This witness testified that he was the jailer for the Macoupin County Sheriff's Department, that on the night in question he was riding to work with Deputy Robertson, that he was in the squad car when the initial stop was made, that the defendant drove his vehicle to the Gillespie Police Station, that at the police station he watched the defendant while the city policeman and Sergeant Robertson went over to Sweetpea's Tavern to investigate a fight, and that the Macoupin County Sheriff's log showed 15 males incarcerated in the Macoupin County jail on the night of the arrest.

*Evidence on defendant's motion to suppress (hearing date February 23, 1979).*

(a) Jennifer Eads:

This witness testified that on the date of the occurrence she lived and worked at the Dairy Queen in Litchfield, that she saw the minor that day after the police brought him to her house and that she had observed the white El Camino or Ranchero drive past the Dairy Queen two times.

(b) Sandy Kessinger:

This witness testified that she is 16 years old, lives in Litchfield, worked at the Dairy Queen on the date in question, saw the victim on that date at the Dairy Queen and that she saw an El Camino go by on Union, she testified that they had called the minor and asked him if it had a cover on the back, and that someone called the police and gave them this information.

(d) David Dehme:

This witness testified that he was a firefighter for the Litchfield Fire Department for three years, that he was employed in that capacity on the date of the occurrence, that he received a phone call from the minor, that he made a notation of the Litchfield radio log report and that he made a radio dispatch for a Litchfield city patrolman to go the residence of the minor.

(d) Joeline Leonard:

This witness testified that she was employed by the Gillespie Police Department for a year and one half, that at the request of the police officers she pulled photographs from the police department's file with the help of Patrolman Jackson, that Patrolman Jackson chose the photographs for the lineup and that this was the first time she had ever assisted in pulling photographs for such a lineup. She had made a notation on the Gillespie Police Department's log concerning the report by the victim's step-father, and she had verified that the defendant was wanted for questioning by the Litchfield Police Department and identified the photographs in the photographic lineup. She further testified that she

didn't hear the conversation at the time the minor was observing the photographs.

At the conclusion of the evidence the trial court took the motions under advisement.

On March 29, 1979, counts two and three were filed, a warrant was ordered to issue, and bond was set in the sum of $25,000.

On March 30, 1979, the motions to suppress identification and the motion to suppress evidence were denied, and all undecided motions were set for hearing on April 17, 1979.

On April 17, 1979, the defendant made a motion for a prompt preliminary hearing regarding the two additional charges. The trial court, relying upon *People v. Redmond* (1977), 67 Ill. 2d 242, denied the motion, finding the new information was not completely unrelated to the subject matter of the original preliminary hearing.

On the same date a motion to produce was called for hearing concerning conversations that the State's Attorney of Montgomery County, Kelly Long, had had with a Grover Webb, who is employed by the Division of Criminal Investigations of the Department of Law Enforcement, Springfield. The State's Attorney had filed an objection to reducing the conversation to writing of this witness. Apparently Mr. Webb had been listed as a witness by the defendant. The trial court allowed this motion. The next motion was a protective order precluding statements to the press, radio or television, which apparently was allowed, the trial court stating it should apply to counsel on both sides.

The arraignment on the additional counts was continued to a later date to afford the attorney for the defendant an opportunity to appeal the court's denial of a prompt preliminary hearing. The arraignment was held on June 26, 1979.

From April 17, 1979, until the date of the trial on December 10, 1979, almost every conceivable type of motion allowable in criminal pretrial procedures was filed on behalf of the defendant and the People. They included but were not limited to motions to renew previous motions, motions to sequester the jury, motion for psychiatric examination of the victim, several motions to produce, motion for a bill of particulars, ad infinitum.

The trial court, showing the patience of Job, held hearings on motions on August 31, 1979, September 4, 1979, September 13 and 14, 1979, September 27, 1979, and a pretrial conference was held on November 30, 1979.

*Evidence at the trial.*

People's evidence:

(a) Minor victim's step-father:

This witness testified that he was the step-father of the minor victim,

that they lived in Litchfield on the date of the occurrence, and that on May 29, 1978, he saw an El Camino occupied by a man driving towards Gillespie. He described the El Camino as silver and white or gray and white with a white tarp over the bed of the pickup. He identified the defendant as being the person he saw at the Gillespie Police Department. He had no personal knowledge of any of the events on the date of the occurrence.

(b) Bradford Ozee:

This witness testified that he was a police officer of the City of Litchfield for two years and seven months, that he investigated the occurrence by interviewing the victim at approximately 2:45 p.m. on the date in question and that he went to the victim's house as a result of a radio dispatch. He further testified he took the victim to the Gillespie Police Department on May 29, that they arrived at the Gillespie Police Department around 10:28 p.m., that they saw a silver and white El Camino there, that the El Camino had a black interior, that a picture was lying on the seat, and that a black Flair pen was in the ash tray at an angle pointing towards the driver. He further testified as to the changes in the defendant's appearance since May 29, 1978, and as to the defendant's age from a drivers license that the defendant gave him. He also testified that the Flair pen had been handed over to him and that he had locked it in his locker at the Litchfield Police Department, and that the Flair pen was black and wrote with green ink. On cross-examination he testified that the window to the El Camino on the driver's side was open and that the door was unlocked, and that neither the El Camino nor the Flair pen was processed for fingerprints. He testified that as a result of the radio dispatch on the date of the occurrence he proceeded to the house of the victim and was met there by Officer Cahill and that they both went into the house.

(c) The minor victim:

The victim testified that on the day of the occurrence he was 15 years old, that he lived in the city of Litchfield, that he was walking to the National Store to cash stamps in a stamp book, that as he was walking in front of Johnny's Sporting Goods this man pulled up beside him, and that he started to run but the man got out of the car and pulled him into the El Camino. He further testified that he was told not to try to get out "cause he had a gun in the glove compartment."

He testified as to the exterior and the interior color of the El Camino, that he wrote his address on a grocery receipt at the instructions of the defendant with a black Flair ink pen that wrote with green ink. He also testified that the defendant's hair was shorter now and of a darker color than on the date of the occurrence. He described the clothing of the driver, that the driver was wearing yellow sunglasses. He testified that he

was in the motor vehicle for approximately 45 minutes, that they went toward Mount Olive, out in the country, just past "Krause's Junk Yard" and that at that time the defendant pulled down the victim's pants and put his mouth on his penis.

He further testified that he was driven back to Litchfield, let out of the El Camino, went into his house, and that the El Camino shortly thereafter drove past his house. He testified that on the date in question and some time thereafter he did not mention the sexual aspects of the case because he was "ashamed and embarrassed."

He further identified certain of the People's exhibits including photographs, the Flair pen, and a map of the route the El Camino was driven on the date in question.

The minor witness was cross-examined extensively on all aspects of his in court testimony and especially as to why he did not jump out of the El Camino when it stopped at stop signs. He testified that the El Camino never made a complete stop and that the defendant had already told him that he had a gun in the glove compartment.

(d) William A. Dolahite:

This witness testified that he was chief of police of the city of Litchfield for 11½ years and had been a patrolman for two years prior thereto, testified as to his qualifications as a certified police officer, testified concerning the rural area in South Litchfield Township, and that he had taken the minor victim to the area where the offense allegedly took place in Montgomery County, Illinois. He further testified concerning a plat of South Litchfield Township and concerning the photographs he had taken.

The witness testified on cross-examination concerning the road that the El Camino allegedly took to Krause's Junk Yard, that it was a macadamized road, well traveled, and that he had no personal knowledge of the occurrence.

(e) Sister of the victim:

This witness testified that she was a sister of the victim, that she was 17 years old, that on the date of the occurrence she was working at the Dairy Queen, and that Brad Ozee brought the victim to the Dairy Queen and that they then went home.

She further testified that on the date of the occurrence she saw a silver El Camino with a white cover in Litchfield and that she saw the vehicle again three times on the 29th on Route 16.

Defendant's evidence at the trial:

(a) Irene Scott:

This witness testified that she lives in Springfield, Illinois, that she has known the defendant for appoximately two years, that the defendant's property adjoins the property she was renting on May 28, 1978, that at 2 to

2:30 in the afternoon she saw the defendant mowing his yard, that she had a conversation with the defendant concerning kids throwing shingles off of the defendant's garage, and that she remembers the date because she had taken flowers to her husband's grave.

On cross-examination the witness testified that she didn't know the exact time that the defendant arrived at the house or the exact time he left, that she saw him leave three or four times, that he was driving a black and white Cadillac, and that's the only vehicle she saw him in that day.

(b) Jane Ginder:

This witness testified that she lives on South Eleventh Street in Springfield, Illinois, that she has known the defendant for 2½ years, that on May 28, 1978, she saw the defendant around 11 a.m., that he was getting tools to take to his other house, that she saw him several times that day, that the last time she saw him was around 4 p.m. in his back yard, that she saw the defendant's daughter with him during the day, that she remembered the date of the occurrence because it was her wedding anniversary and that she had been painting a birdbath that she received for an anniversary present.

On cross-examination, this witness testified that the defendant was remodeling the inside of the house and was working around the outside, "sawing, drilling, nailing," that he was by himself most of the time except when his daughter was there, that the defendant was driving a silver and white El Camino, that the defendant also owns a Cadillac, that on the date in question he was driving the El Camino, that the defendant from time to time wore sunglasses but she couldn't describe the sunglasses and that the El Camino did not, on May 28, 1978, have the white tarp on the bed because he had been hauling junk.

(c) Kenneth Ginder:

This witness testified that he was a deputy sheriff, Sangamon County for 11 years, that he resides on South Eleventh Street in Springfield, Illinois, that he had known the defendant for 2½ years, that on May 28, 1978, he was residing at the same place, that on the date in question he saw Mr. Levine from 11 a.m. until approximately 4 p.m. from time to time in Mr. Levine's back yard, that the witness had been working on a greenhouse he had received on his anniversary on the same date, and that he was listening to the Indianapolis 500 which ended about 4 o'clock in the afternoon.

The witness further testified that on the way to Litchfield to testify he traveled at the approximate speed limit and it took him slightly over 50 minutes as he set his stop watch from the time he left his garage.

On cross-examination the witness was questioned as to his duties at the Sangamon County sheriff's office, that he had met Ms. Scott one time and that was in the defendant's attorney's office, that he had never seen

the defendant with yellow oval sunglasses, that he did not see a white tarp on the silver and white El Camino, that Mr. Levine owns two Cadillacs but that he did not see him driving them at that time. The witness further testified that it was impossible for the defendant to be in Litchfield between the hours of 2 and 3 p.m.

(d) Grover Webb:

This witness testified that he is a special agent for the Illinois Department of Law Enforcement, that he knows the defendant, that on May 28, 1978, he saw the defendant at this residence between 1:15 and 1:45 p.m., that he was driving by the residence, saw Mr. Levine and honked his horn, that Mr. Levine owns a black and white Cadillac and a silver and white El Camino, that he saw the El Camino parked at the house on that date, and that he passed back by about an hour later in the afternoon and the El Camino was still parked at the house somewhere around 2:30 or 2:45 p.m.

The witness further testified that he had relayed this information to the State's Attorney of Montgomery County prior to the date of the trial.

On cross-examination the witness testified that he had known Mr. Levine for about three years, that the first time he met Mr. Levine was when he was trying to purchase an apartment building from Levine, that he had been talking to Mr. Levine from time to time concerning an ironworker's case that Mr. Levine was involved in in Springfield, and that defendant had given him some information of a confidential nature on cases involving prostitution and local pimps.

Rebuttal evidence by the State:

(a) Bradford Ozee testified that People's Exhibit No. 7 for identification was an accurate portrayal of the scene in the exhibit and that the photograph was taken on May 29, 1978.

(b) Dave Williamson:

This witness testified that he is employed by radio station WTIM in Taylorville, Illinois, that on May 28, 1978, his radio station carried the Indianapolis 500 race, and that the programming records of the station show that the broadcast of the Indianapolis 500 was over at "2:44:30, i.e. 30 seconds past 2:44."

Upon cross-examination the witness was questioned concerning other radio stations in the area that might have carried the Indianapolis 500 on the date in question, questioned concerning the area that the radio signal carries, and questioned about the radio log, which was made defendant's exhibit No. 1.

*Closing arguments*

During the course of closing arguments the State's Attorney of Montgomery County made certain statements with which the defendant takes issue.

In discussing witness Ginder's testimony, the State's Attorney stated, "but it's just another indication of where a defense alibi witness didn't tell the truth."

In discussing witness Webb's testimony, the State's Attorney made this statement, "but it's apparent that Mr. Levine was Agent Webb's snitch or informant or whatever you want to call it, concerning prostitution and pimping in this area."

No objections were made to any remarks made by the State's Attorney in his initial argument. In his final argument to the jury he made the following statements;

"We've been accused of improper police investigation. Both Mr. Weiner and Mr. Fields know how many hours and what all was done in this period. They know how much more than the majority of the people in here as to the investigation of the case."

And then later this statement;

"And as hard as it may be for you to believe the people would lie in criminal cases, it's certainly not unusual."

Later in discussing Agent Webb's testimony, he made the following comments:

"Just a brief comment on Grover Webb. Mr. Webb is a law enforcement officer. But it was brought out on voir dire by Judge Dailey, you are not to give any more weight to police officer's testimony than you would anyone else. Mr. Weiner said something about what interest would he have."

"If you remember the cross-examination, the first call of Mr. Webb to me was not about the alibi, it was about getting Mr. Levine off. The alibi came in calls two and three."

And then, in commenting on Attorney Fields' closing argument, the State's Attorney stated:

"Much of the information, which Mr. Fields was talking about, the absence of telling you all about the police investigation, is hearsay. If we tried to that it is improper. The defense counsel would both object and throw a fit."

State's Attorney also made the following comment:

"There is no uncertainty about his identification. Comment was made by the defense counsel about a line-up. Both defense counsel know that the minor had previously identified the defendant." The defendant's attorney objected to this statement and later stated the reasons on the record as an infraction of the in limine order.

This statement was made in response to the following statement made by the defense attorney's comments in closing arguments:

"Did you hear any testimony that Mr. Levine was placed in a live,

physical line-up alongside other individuals?" The State's Attorney objected to that statement; the court overruled it. Defense attorney then proceeded:

"So that the minor could approach and pick out Mr. Levine from that line-up. Did you hear any testimony to that effect? In fact, the minor says, 'I didn't even see Mr. Levine on the 29th. On the 29th when finally Mr. Levine was brought into these circumstances, I didn't even see him.' "

## The Opinion

The defendant claims the trial court erred in denying the defendant's motion to suppress the in court identification of the defendant by the minor. The defendant apparently bases his contention upon the fact that the photographic lineup was so suggestive as to taint the in court identification.

We have reviewed the photographic lineup in question and we certainly agree with the defendant that it was suggestive. The photographic lineup consists of five photographs, four in black and white, of male subjects, much younger than the defendant, while the defendant's photograph portrayed the defendant, in color, wearing yellow, shaded sunglasses. The trial judge allowed a motion in limine and ordered the State or any of its witnesses not to refer to the lineup. The State complied with this order until final closing argument, although the defense attorneys did make mention of the fact that there was not a lineup in closing arguments. We must now decide if the photograph in question was so suggestive as to taint the minor's in court identification of the defendant. It is to be noted that the complaining witness saw the photograph in question on May 29, 1978, but did not actually see the defendant until the preliminary hearing on June 12, 1978. At the preliminary hearing, the victim identified the defendant.

At the December 22, 1978, hearing on the motion to suppress, the victim testified that he had described to the police the defendant as "kind of old and had yellow, shaded sunglasses and kind of long, greasy hair." He further testified that the man that picked him up was "50, 55 years old," that his hair was down to the back of his neck and that the one thing that he remembers most was the man's face. He further testified that the man had thick eyebrows, and a ring on his finger. He testified concerning the length of the man's sideburns. He testified that the event occurred around 2 p.m., that it was light, that the man was not wearing a mask, that he could see his face and that he was in the presence of the man for approximately 45 minutes.

The defendant, when he challenges the identification procedures used by the investigating authorities has the burden of proving "the

confrontation conducted was so unnecessarily suggestive and conductive to irreparable mistaken identification that he was denied due process of law." *People v. Johnson* (1970), 45 Ill. 2d 38, 45-46.

There is no question that when an accused is in custody a physical lineup is preferable over a photographic lineup. The Illinois Supreme Court in discussing this subject has stated, "[T]he use of photographs as a basis for identification is ordinarily not a desirable practice when the suspect is in custody and a lineup is feasible, for the photo procedure detracts from the quality of any identification which follows. We believe that photographic identification procedures ought not be employed when the suspect is in custody and a lineup is otherwise feasible." *People v. Holiday* (1970), 47 Ill. 2d 300.

In *Simmons v. United States* (1968), 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971, Justice Harlan, speaking for the court, made this observation:

■■ "Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

■■ In determining whether or not the photographic identification is so impermissibly suggestive as to be inadmissible certain criteria have been propounded by the Supreme Court. The factors among others that should be considered are:

(a) Opportunity of the witness to view the criminal at the time of the crime.

(b) The witness' degree of attention.

(c) The accuracy of his prior description of the criminal.

(d) The level of certainty demonstrated at the confrontation.

(e) The time lapse between the crime and the confrontation.

*Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375; *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243.

We turn, then to the case at hand;

(a) The opportunity to view. The victim in this case testified that he was with the defendant for a total of 45 minutes, and had an opportunity to observe the defendant and hear his voice. He further testified that it was on a Sunday afternoon at about 2 p.m. and that it was daylight.

(b) The degree of attention. The victim in this case, although 15 years old, at the time of the occurrence was not a casual passing observer. He was in the El Camino with the accused and certainly, under these circumstances, cannot be accused of being inattentive. His testimony shows otherwise.

(c) The accuracy of the description. The victim gave a description of the defendant as to his age, color of his hair, ring on his finger, the length of his sideburns, the writing on a grocery receipt and the Flair pen. He was also able to identify the sunglasses as to shape and color that the accused was wearing.

(d) The witness' level of certainty. The witness immediately identified the photograph of the accused at the Gillespie police station, and although there is no question that the lineup was suggestive at the time of the initial identification, the witness made an absolute positive identification without being prompted by anyone.

(e) The time between the crime and the confrontation. The victim immediately after the crime gave the investigating officer a description of the accused and of the automobile. Within 30 hours he positively identified the photograph of the accused.

But even more important, the victim in this case has stood the "test of cross-examination." He was cross-examined by the defendant's attorney at the preliminary hearing on June 12, 1978; at the hearing on December 22, 1978, he was subjected to extensive cross-examination concerning his identification of the accused and finally at the trial itself before a jury of adults he was further cross-examined concerning the events on May 28, 1978.

We cannot say that under the totality of the circumstances of this case that there is a substantial likelihood of irreparable misidentification.

From the record of this case, which we have reviewed, it is quite apparent that the victim's identification of the defendant had an origin independent of the lineup, and his in-court identification of the defendant was properly received in the evidence. *People v. Connolly* (1973), 55 Ill. 2d 421; *People v. Pagan* (1972), 52 Ill. 2d 525.

We agree with the trial judge that the pretrial identification procedure used by the investigating authorities was far from perfect and with his conclusion in granting a motion in limine concerning a photographic lineup. We also agree with the trial judge that the defendant has failed to meet his burden of proof in regard to the pretrial identification procedures.

The second issue raised by the defendant is that he was not proven guilty beyond a reasonable doubt. It has long been the law of the State of Illinois that it is the jury's function to determine the facts and to decide questions of credibility of the witnesses. In *Rafferty v. People* (1874), 72 Ill. 37, 42, the supreme court, in discussing conflicts of testimony, made the following comments:

"If, when the evidence is all carefully considered and weighed, it appears that it is wholly wanting in respect to some necessary element of the crime, or if there is a conflict in evidence, and there is such a clear preponderance of evidence against the verdict, as to suspend the judicial mind in serious doubt as to the guilt of the accused, then, in either case, we ought to grant a new trial.

Questions of credibility of witnesses are peculiarly for the jury."

The same court in discussing evidence from a single witness stated:

"But, when the verdict rests solely upon the evidence of a single witness, and direct evidence of impeachment is introduced to such an extent as to lead to the conclusion that the jury was actuated by passion or prejudice in disregarding such impeaching evidence, then we ought to set the verdict aside, and direct a new trial."

In *People v. Diekelmann* (1937), 367 Ill. 372, the court in discussing a situation where there was conflict in testimony stated:

"There was some conflict in the testimony. The jury saw and heard the witnesses testify. This court was not afforded that opportunity. The weight to be accorded the testimony of the several witnesses was within the province of the jury, and unless this court is convinced that the verdict of the jury is contrary to the weight of the evidence it is not within the sphere of this court to set aside the verdict."

As late as December 1980, the present supreme court in *People v. Warmack* (1980), 83 Ill. 2d 112, 127-28, in discussing failure to prove a defendant guilty beyond a reasonable doubt, stated:

"Defendant also contends that the State failed to prove him guilty beyond a reasonable doubt. We do not agree. Defendant was identified by eyewitnesses in photographic displays, a lineup and at trial, and another witness placed defendant near the scene riding a bicycle. Corroborating physical and circumstantial evidence, such as the recovery from defendant's residence of the clothing identified as having been worn by the killer, further buttressed the State's case. Significantly, the defense impeached one eyewitness by showing her prior identification of someone other than defendant as the killer, and the defense ably pointed out other weaknesses in the State's proof. We cannot say, however, that the efforts of the defense created a reasonable doubt of guilt. At best, the defense raised questions of fact and credibility properly left for resolution by the jury."

■■ Appellate courts will not interfere with the verdicts of juries unless the verdict is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of guilt warranting their interference. *People v. Stansberry* (1971), 47 Ill. 2d 541.

The mere fact that a path is well worn by judicial history is a persuasive reason for following it.

Defendant raises several issues concerning the conduct of public officials, including the trial court, of Montgomery County.

Specifically he complains of the State's Attorney's closing arguments, the manner in which the State's Attorney complied with court's orders on discovery and other matters of alleged misconduct by the State's Attorney. He also raises issues concerning the Montgomery County sheriff's alleged contact with the jury and alleges that the trial court communicated with the jury outside the presence of the defendant's counsel. We will discuss each of these separately.

■■ During the course of closing arguments, the State's Attorney, in discussing the alibi witnesses of the defense, stated:

"But it's just another indication of where a defense alibi witness didn't tell the truth."

In discussing Mrs. Scott's and Agent Webb's testimony, he stated:

"But it's apparent that Mr. Levine was Agent Webb's snitch or informant or whatever you want to call him, concerning prostitution and pimping in this area."

"And as hard as it may be for you to believe the people to lie in criminal cases, it is certainly not unusual."

In reply to an argument made by the defendant's attorney, Mr. Long stated:

"We have been accused of improper police investigation. Both Mr. Weiner and Mr. Fields know how many hours and what all was done in this period. They know how much more than the majority of the people in here as to the investigation of this case."

He also stated in his closing arguments that:

"The minor described the yellow sunglasses in detail. And Mr. Levine still had those on the 29th of May, 1978."

The defendant claims that the State's Attorney misled the court when he told him during the pretrial discovery proceedings that he didn't remember what Agent Webb told the State's Attorney in his first discussion with him. On final argument the State's Attorney stated to the jury:

"If you remember the cross-examination, the first call from Mr. Webb to me was not the alibi. It was about getting Mr. Levine off. The alibi came in calls two and three."

He also made the following remark about the attorneys:

"Much of the information, which Mr. Fields is talking about, the absence of telling you about the police investigation, is hearsay. If we tried to do that it is improper. The defense attorney would both object and throw a fit."

An objection was made by Mr. Fields, attorney for defendant:

Mr. Fields, "Objection to our throwing fits. We may object vociferously, but we don't throw fits. We don't throw fits." The court instructed the State's Attorney to proceed. And finally, in his closing remarks, the State's Attorney made the following remarks:

"There is no uncertainty in his identification. Comment was made about defense attorney about a line-up. Both defense counsel know that the minor had previously identified the defendant."

This remark was made by the State's Attorney, when Mr. Fields, during his closing argument, made the following statement:

"Did you hear any testimony that Mr. Levine was placed in a live physical line-up beside other individuals?"

The State: "Your Honor, I object to this."

The objection was overruled and Attorney Fields continued:

"So that the minor could approach and pick out Mr. Levine from the line-up. Did you hear any testimony to that effect? In fact, the minor said, 'I didn't even see Mr. Levine on the 29th. On the 29th when finally Mr. Levine was brought into these circumstances I didn't even see him.'"

At the time the State's Attorney made the remarks about identification, an objection was made by the defendant. Mr. Weiner asked that their objection be noted, and later they made an objection for the record concerning that statement. Attorney Weiner asked for a mistrial on the grounds of the comment by the prosecution that there was a previous identification of the defendant by the minor. The court held that the remark was not consequential to the jury and overruled the objection.

The trial court, although declining to make any specific findings as to whether the pretrial photographic lineup was suggestive, did grant, without objection by the State's Attorney, a motion in limine by the defendant to preclude reference at trial to the photographic identification.

During the course of the initial closing arguments by the State's Attorney no objections were noted by the defendant's attorneys. During the State's Attorney's final closing arguments the defendant's attorneys made two objections as noted above.

As a general rule in order to preserve the record, an objection must be made. Because the defendant failed to make objections to the prosecutor's remarks during final argument, these issues are not properly before this court, and we deem it to be a subject not properly preserved for review. (*People v. Travis* (1976), 43 Ill. App. 3d 44.) The exception to this

rule is if the remarks are so inflammatory or prejudicial so as to deprive the defendant of a fair trial. *People v. Berry* (1960), 18 Ill. 2d 453.

The record in this case shows that the defendant was represented by able, capable and experienced trial lawyers. We are of the opinion that in the atmosphere of the courtroom at the time these remarks were made if they were so prejudicial as to affect the jury's verdict, these attorneys would have objected. While the remarks were probably improper, they were not so inflammatory or prejudicial as to have affected the jury's final determination.

■■ The final objection concerning alleged prosecutorial misbehaviour was the remark about the previous identification of the defendant by the victim. The prosecutor was referring to the photographic lineup. The trial court had allowed a motion in limine and instructed both sides not to mention the photographic lineup. We are of the opinion this was a fair comment. It is to be noted that this remark was not made until the final closing argument of the prosecutor and that the subject was brought up by the defendant's attorney in his closing arguments when the defense attorney inferred the defendant had never been identified by the victim. Although the remark would have been better left unsaid, it is not so prejudicial as to warrant reversal. Where it appears that improper remarks do not constitute a material factor in the conviction or that they are of such a minor character that prejudice to the defendant is not their probable result, the verdict will not be disturbed. *People v. Berry* (1960), 18 Ill. 2d 453.

The defendant next contends that State's Attorney Long's failure to comply promptly with discovery orders was so prejudicial as to amount to a violation of due process and equal protection of the law. We have reviewed the record in this case and certainly do not approve of either the prosecutor's or the defense attorney's conduct during the pretrial stages of this case in regards to discovery. As is often the case, the State's Attorney and the defendant's attorney played "Mickey Mouse games" with the Supreme Court Rules in regards to discovery. The defendant is particularly disturbed concerning the prosecutor's reply to the discovery in regards to Agent Webb, but it is to be noted that the record shows that the trial court found that the State's Attorney had complied as early as September 27, 1979, some 2½ months prior to the trial date in this case. Further, the defendant complains because the State's Attorney objected to Agent Webb being a witness for the defendant at the trial, but the record affirmatively shows that the defense had supplied Agent Webb's name to the prosecutor and therefore this was a frivolous objection that had no bearing whatsoever on the constitutional rights of the defendant.

Although we abhor the manner in which both sides treated discovery in this case, before the trial date apparently all discovery was completed;

therefore, we can find no violation of due process that would have materially affected the jury's verdict as a result of the failure of both parties to comply with the court's discovery order.

The defendant also complains that the trial court erred in not making available a certain letter which was received and was in the possession of the State's Attorney during the pretrial discovery process. The court held an *in camera* inspection of this letter and decided it should not be made available to the defendant. The letter in question was postmarked St. Louis, Missouri, March 6, 1979, and was addressed to William Dolahite, Police Department, Litchfield, Illinois. The letter in question was unsigned. We have reviewed the letter and find that it is nothing more than an anonymous letter and that there is no violation of principles enunciated in *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.

The defendant also complained concerning conduct of the Sheriff of Montgomery County during the course of the trial. It appears that Sheriff Carlock sat with the State's Attorney during voir dire examination and that he was listed as a potential witness. It also appears that several of the jurors knew the sheriff and that one of the jurors had done business with the sheriff previously. The defendant also claims that during the jury deliberation the sheriff took the jury to dinner that evening. There is nothing in the record to indicate this, and there was no evidentiary hearing held to determine whether or not the sheriff did take the jury to dinner and whether or not he had any conversation with the jurors during their deliberation. The defendant relies on *Turner v. Louisiana* (1965), 379 U.S. 466, 13 L. Ed. 2d 424, 85 S. Ct. 546. In the *Turner* case the chief prosecution witnesses were Deputy Sheriffs Vincent Respone and Hulon Simmons. Both of these deputies testified at the trial as part of the State's case. Deputy Simmons also was involved in taking a written confession from the defendant. During the course of the trial and while the jury was deliberating, the deputies drove the jurors to a restaurant for meals, to their lodgings each evening, they ate with them and conversed with them throughout the entire trial. The defendant was convicted of murder and was sentenced to death. Under these circumstances the Supreme Court reversed the conviction and remanded the case for further hearing. It is to be noted that the defendant's counsel moved for a mistrial immediately when he was aware that each of the deputies were serving as deputy sheriffs with close connections to the jury. Counsel for defendant in this case did not have an evidentiary hearing, and there is nothing in the record to show that Sheriff Carlock in any way conversed with or was in touch with the jury at any time during the course of this trial and especially during their deliberation.

■■ The defendant also complained because some of the jurors knew the sheriff and because Michael Charnisky, the jury foreman, had had some

business dealings at one time with the sheriff. The defendant made no objections to this juror other than "subject to the record, tender." There was no challenge for cause by the defendant during the course of voir dire examination of this prospective juror, who stated that he would not give any greater weight to testimony of a police officer than any other witness. The mere fact that a prospective juror may be acquainted with prospective witnesses or with the attorneys involved in the case is in and of itself not sufficient grounds to challenge for cause. *People v. Cole* (1973), 54 Ill. 2d 401.

We have reviewed the record, and there is nothing in the trial record that would show any official misconduct by the sheriff of Montgomery County in this case.

The defendant also complains that the trial court communicated with the jury outside the presence of the defendant and his counsel. At the post-trial motion, the following conversation took place between the defense counsel and the trial judge:

"Your Honor, one other thing, if I may. I would like to have a record of this made in some way. As I recall, on this date when we were waiting for the jury to return, it was approximately 9 o'clock and the Court indicated to us that the jury was going to be brought back. And then the jury came in and the representation was made at that time that the jury had not reached a decision, I believe.

And then the jury came in at approximately 9:15 and had a decision. And what I am wondering, Your Honor, is if the Court could inform us if any communications were made by the Court to the jury during that period of time?

THE COURT: Well, first of all, the only communication the Court can make with a jury is to call them into the courtroom in the presence of counsel and do things publicly. My remembrance of that evening was that as approximately the 9 o'clock hour approached I asked the bailiff to come in, instructed him to go up, knock on the door, and ask whether or not they had reached a verdict.

And upon the return of the bailiff he informed me that—I don't remember the exact words—but in the nature that they were getting ready to sign the verdict or something along that line. That's my remembrance of the evening.

MR. FIELDS: Just for the record, Your Honor, it was at about the same time the Court came through—the Sheriff, Sheriff Carlock, came through and indicated to us at that time it was his understanding that the jury had not reached a decision. So I was just asking for some clarification for the record on that point.

THE COURT: "All right, you may proceed."

Apparently the defendant is trying to convince this court that it's a

violation of the defendant's rights if the trial court communicates through the bailiff with the jury concerning their progress. He relies on *People v. Rohwedder* (1967), 78 Ill. App. 2d 211. In this case the jury was deliberating from about 11:30 a.m. During their deliberations the trial judge left for his home in Harrisburg, Illinois. At about 4:30 p.m. another judge in St. Clair County called the jury into the courtroom, outside the presence of the defendant and their attorneys and without prior consultation with them. The purpose was to determine whether or not the jury was making progress.

■■ ■ In *Rohwedder*, the court, in commenting upon the jury system, stated:

"The jury is isolated so it can conduct its deliberations in secret with fairness and justice to all parties. The trial courts must clearly understand that the rights of the State and the rights of the persons charged with crime can best be protected when the jury are left alone to deliberate without coercion from anyone. We believe that the communication between the court and the jury in the present case deprived the defendant Rohwedder of the fair and orderly trial that he was entitled to under our system of jurisprudence." (78 Ill. App. 2d 211, 217-18.) Although we agree with the rule enunciated in *Rohwedder*, we cannot say that the trial judge's action in this case was coercive or resulted in any influence upon the jury's verdict. It is to be noted that the bailiff reported to the trial court that the jury was in the process of signing their verdicts. Even if this is to be considered an unauthorized communication by the trial court with the jury, it would be harmless under the state of the record in this case. Before a jury verdict will be set aside because of an unauthorized communication with the jury, it is necessary for a defendant to show prejudice. *People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485.

The defendant raises the issue that the trial court erred in denying the defendant's demand for a prompt preliminary hearing on the two additional charges of deviate sexual assault and indecent liberties with a minor which were filed on March 29, 1979. The defendant was afforded a preliminary hearing on the initial count on June 12, 1978. On April 16, 1979, the defendant filed a demand for prompt preliminary hearing on the additional charges that were filed some 10 months after the original charges were filed.

The defendant calls our attention to section 7 of article 1 of the Illinois Constitution of 1970 that provides, in part, as follows: "No person shall be held to answer for a crime punishable by death or by imprisonment in the penitentiary unless either the initial charge has been brought by indictment of a grand jury or the person has been given a prompt preliminary hearing to establish probable cause."

On the date of the offense charged in the original information, filed

herein, there was in effect in the State of Illinois a statute (Ill. Rev. Stat. 1977, ch. 38, par. 111—2(e)), which states:

"Where the prosecution of a felony is by information or complaint after preliminary hearing, or after a waiver of preliminary hearing in accordance with paragraph (a) of this Section, such prosecution may be for all offenses, arising from the same transaction or conduct of a defendant even though the complaint or complaints filed at the preliminary hearing charged only one or some of the offenses arising from that transaction or conduct."

In *People v. Redmond* (1977), 67 Ill. 2d 242, the Illinois Supreme Court upheld the constitutionality of section 111—2(e) against challenges under article 1, section 7 of the Illinois Constitution of 1970 and the due process clause of the United States Constitution (U.S. Const., amend. XIV).

This court, in *People v. Harris* (1979), 68 Ill. App. 3d 12, recognized the ruling in *Redmond* and upheld a factual situation where an information was filed in two counts, charging the defendant with aggravated kidnapping, and three months later additional counts charging armed robbery and burglary were filed. The trial court in *Harris* dismissed the subsequent counts, but this court, relying on *Redmond*, reversed the trial court findings and ordered the armed robbery and burglary counts reinstated. The trial court did not err in denying the defendant an additional preliminary hearing on the fact situation presented in this case.

■ The defendant next complains that the court erred in giving People's jury instruction No. 12, IPI Criminal No. 3.02. This instruction concerns itself with circumstantial evidence and states:

"Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict." The defendant claims that there is no circumstantial evidence in this case, that it is all direct testimony. Of course this argument must fall because of the black Flair pen that writes with green ink, the El Camino vehicle and the yellow shaded sunglasses that the defendant was wearing on the night of his arrest. While it is true that where all the evidence is direct, IPI Criminal No. 3.02 should not be given, but in *People v. Cruz* (1979), 71 Ill. App. 3d 76, the court held that if there is circumstantial evidence tending to link the defendant with the crime, then it is permissible to give IPI Criminal No. 3.02. In the case at hand, the testimony was not all direct, but there was certain circumstantial evidence tending to link the defendant with the crime. We are of the opinion that the trial court did not err in giving this instruction.

■■ The defendant complains that the court erred in admitting People's

exhibit No. 7 in rebuttal and allowing witness Brad Ozee to testify in rebuttal. The minor victim in this case testified at the time of the occurrence the defendant was wearing a light blue shirt, button down, with yellow shaded sunglasses. People's exhibit No. 7 is a photo of the defendant taken on the night of his arrest, showing the defendant wearing yellow shaded sunglasses. There was also testimony by witness Ginder during the defendant's case that she thought the defendant wore sunglasses with a silver frame and dark lenses, but she could never recall him wearing any yellow oval sunglasses. There was also testimony by Mr. Ginder that he had never seen the defendant in yellow oval sunglasses. The glasses that he saw him wearing were prescription sunglasses.

People's exhibit No. 7 was admitted for the limited purpose of showing that on the date of the arrest the defendant was wearing yellow oval-shaped sunglasses, and the witness Brad Ozee testified that the exhibit was an actual portrayal of the defendant. It is apparent that this exhibit was offered and the testimony was offered to rebut the testimony given by the witnesses Ginder concerning the type of sunglasses that the defendant was known to have worn.

The defendant further claims that the trial court erred in conducting the voir dire examination of the jurors. The trial court conducted the voir dire without assistance of the attorneys.

The conduct of voir dire examination of prospective jurors is controlled by Supreme Court Rule 431, which states:

"In criminal cases, the voir dire examination of jurors shall be conducted in accordance with Rule 234." Ill. Rev. Stat. 1977, ch. 110A, par. 431.

Supreme Court Rule 234 states:

"The court shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or may permit the parties to supplement the examination by such direct inquiry as the court deems proper. Questions shall not directly or indirectly concern matters of law or instructions." Ill. Rev. Stat. 1977, ch. 110A, par. 234.

The Supreme Court of the State of Illinois in *People v. Jackson* (1977), 69 Ill. 2d 252, made the determination that the litigants have a basic constitutional right to an impartial jury but that the examination of the prospective jurors by the court or by the attorneys is not a part of the right to trial by jury but is an administrative detail which the courts can regulate in their sound judicial discretion. We have examined the voir dire of prospective jurors conducted by the trial court in this case and find no abuse of judicial discretion.

■■ The next issue raised by the defendant that merits discussion is the refusal of the trial court to order a second psychiatric examination of the complaining witness. At the request of the defendant, the court ordered a psychiatric examination which was conducted by a Dr. Zilinskas. The substance of the doctor's report was that "He is not suffering from any mental illness and definitely cannot be judged as an unfit witness. He can testify and his word can be accepted as reliable." The doctor after examining the complaining witness in his office made the decision that the minor in this case was of sufficient intelligence that psychological testing was not necessary.

Subsequently, the defendant moved the court for another psychiatric examination, which the court refused. The defendant, relying on the *People v. Rossi* (1972), 52 Ill. 2d 13, argues that the trial court erred in not ordering a second psychiatric examination. Of course, Rossi stands for the proposition that the trial court may order a psychiatric examination of a complaining witness in a sex case upon a properly supported motion for such examination. We cannot find in Rossi where the supreme court said it was essential. In *People v. Glover* (1971), 49 Ill. 2d 78, the supreme court ruled that it was discretionary with the trial court whether or not the complaining witness should be ordered to take a psychiatric examination. In this case, the trial court allowed the defendant's motion for a psychiatric examination, one was conducted and the results filed with the court. It becomes quite apparent that the defendant was not satisfied with the conclusions of the psychiatrist. We know no rule that states that a trial court must order subsequent examinations of the complaining witness, especially under the circumstances in this case. We are of the opinion that the trial court did not abuse its discretion in refusing a subsequent psychiatric examination of the complaining witness.

The trial court signed a judgment and sentence order on February 22, 1980, wherein judgment was entered on the charges of deviate sexual assault, indecent liberties with a child, and unlawful restraint. Further, in the sentencing order the trial court imposed the sentences on the defendant as follows: "Count I—two (2) years imprisonment in the Department of Correction, Count II—fifteen (15) years imprisonment in the Department of Correction, and Count III—eight (8) years imprisonment in the Department of Correction" and further entered costs against the defendant. The State concedes that the conviction for indecent liberties with a minor must be vacated, relying on *People v. King* (1977), 66 Ill. 2d 551.

We have reviewed the other issues raised by the defendant in this appeal and find that they are not noteworthy of discussion.

It is therefore the order of the court that the convictions for deviate sexual assault and unlawful restraint be affirmed and that the conviction

for indecent liberties be reversed and further that the case be remanded to the Circuit Court of Montgomery County for the sole purpose of issuing an amended mittimus pursuant to this opinion.

Affirmed in part, reversed in part, and remanded with directions.

KASSERMAN, P. J., and HARRISON, J., concur.